# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JEFFREY SMITH,**

                Plaintiff,

        -vs-                                                    Case No. 09-C-538

**MEDICAL BENEFIT ADMINISTRATORS GROUP, Inc.,**

                Defendant.

# DECISION AND ORDER

Jeffrey Smith contends that the claims administrator for his workplace health insurance plan, Medical Benefit Administrators Group, Inc. (d/b/a Auxiant), violated the Employee Retirement Income Security Act ("ERISA") when it preauthorized his gastric bypass surgery and then denied his claim for benefits after the surgery took place. In 2009, the Court granted Auxiant's motion to dismiss, reasoning that Smith's complaint was an impermissible attempt to recover benefits he was not entitled to under the Plan. On appeal, the Seventh Circuit held that "[a]lthough legal relief is not available to Smith, his complaint does set forth a plausible claim for declaratory and injunctive relief based on Auxiant's alleged breach of its fiduciary obligations to Smith." *Smith v. Med. Benefits Adm'r Grp., Inc.*, 639 F.3d 277, 285 (7th Cir. 2011).

After remand, both parties engaged in discovery and filed motions for summary judgment. For the reasons that follow, Auxiant's motion is granted, Smith's motion is denied, and this matter is dismissed.

## I. Background

Smith is a welder for Brenner Tanks, LLC in Fond du Lac, Wisconsin. Throughout the relevant period of his employment with Brenner Tanks, Smith participated in and was eligible for benefits under the Brenner Tank Medical, Prescription Drug and Short Term Disability Plan. At all relevant times, Auxiant was a third party administrator responsible for administering health claims submitted under the Brenner Tank plan. Under the Claims Administration Agreement, Auxiant agreed to provide "utilization review" services. Utilization review services include medical necessity reviews and pre-certification services. Auxiant subcontracts with iProcert, LLC, to perform utilization review services for some of Auxuant's customers, including reviewing proposed services or treatments to determine if those services or treatments are medically necessary. iProcert's services to Auxiant's customers are described in a written Agreement for Medical Management Services.

Smith has dealt with obesity issues for most of his life. In January 2004, Smith experienced shortness of breath and other symptoms of congestive heart failure and was transported to a hospital for emergency treatment. During that emergency hospital stay, Smith was advised by physicians that he needed to lose a considerable amount of weight for health reasons, and it was recommended that he look into weight loss surgery. Thereafter, Smith began investigating several possible types of weight loss surgery including, but not

limited to, gastric bypass surgery. In June 2005, Smith attended a seminar at the Medical College of Wisconsin presented by Dr. James Wallace and his staff regarding gastric bypass surgery. During that seminar, it was recommended that Smith contact his health plan to determine whether gastric bypass surgery was covered. Dr. Wallace's office told Smith that it was very hard to get an insurance company to cover this type of surgery, but that they knew how to do it.

The Brenner Tank Plan is contained in a written document describing the terms of coverage and applicable exclusions from coverage. The plan contains a series of exclusions, including:

> **Obesity**. Charges for services or supplies furnished for weight reduction or in connection with obesity, including morbid obesity. This includes dietary supplements, foods, equipment, laboratory testing, exams, prescription drugs and obesity surgery, including but not limited to, stomach stapling, gastric bubble, intestinal/stomach bypass or suction lipectomy, regardless of whether or not weight reduction is medically appropriate.

The plan further provides that "pre-certification" is required for various hospitalizations and surgeries, but also provides that "pre-certification approval does not verify eligibility for benefits nor guarantee benefit payments."

Smith received a copy of the Brenner Tank Plan as part of his employment. Brenner Tank has an annual mandatory meeting on company premises where various provisions of the plan are discussed. A copy of the plan document is distributed at these meetings and participants are required to sign a form acknowledging receipt of the document. Smith attended these meetings and received a copy of the Plan. In January 2006, Brenner Tank

distributed a letter to participants that was related to a plan amendment. The letter informed participants that receiving pre-certification of a proposed course of treatment does not mean that coverage will be provided for that treatment: "We also wanted to remind participants that pre-certifying a procedure does not mean that procedure is covered under our plan." Smith also received a health insurance card from Auxiant. The back of Smith's card contains instruction on how to obtain pre-certification, but it warns participants and providers that "**This card does not guarantee coverage and/or benefits.**"

Dawn Peterson is the Human Resources Manager for Brenner Tank. In her position, Peterson has responsibility for issues arising with Brenner Tank's health plan, including working with employees regarding the plan. Ms. Peterson did not have any concerns or problems with Auxiant when Auxiant was the third-party administrator for the Brenner Tank Plan and was happy with the service Auxiant provided. Ms. Peterson did not receive any complaints from Brenner Tank employees about Auxiant's service or that Auxiant's procedures were confusing or difficult to understand. Smith understood that he could consult with Ms. Peterson or others in the human resources department if he had questions about health care coverage. Peterson does not recall speaking with Smith about whether gastric bypass surgery was covered under the terms of the plan at any time before the surgery took place.

Auxiant maintained a customer service team in Wisconsin to respond to questions posed by medical providers or plan participants. Anyone who calls Auxiant for any reason will hear a recording that states: "This call may be monitored for quality assurance. Any

information provided is not a guarantee of benefits or payment and is subject to the terms and conditions in your group's health plan document. Please hold while I transfer." If Auxiant received a call inquiring about precertification for a particular service or treatment under a particular health plan, the call would have been documented in a computerized system called "Quick Link." When receiving calls, Auxiant's customer service workers are trained to look at the participant's written plan document even if the caller only asks about pre-certification. Auxiant employees also direct callers to review their health care plan document themselves to determine benefits. Call service workers in Auxiant's call service center have access to a schedule of benefits available under each particular health care plan documents, as well as a copy of the health care plan document itself. Auxiant call service workers are trained to refer callers directly back to the caller's plan document for questions regarding benefit coverage.

Shortly after attending the seminar at the Medical College, in approximately June or July 2005, Smith claims that he placed a call to a phone number that was on the front of his Auxiant identification card in an effort to determine whether his health plan provided benefits for gastric bypass surgery. Smith spoke with an Auxiant representative who asked for Smith's name and employer group number. During the phone call, Smith told the Auxiant representative that he wanted to know whether gastric bypass surgery was covered by the plan. Smith was told that the procedure was covered as long as it was medically necessary. Auxiant has no record of receiving this phone call.

-5-

Case 2:09-cv-00538-RTR    Filed 04/19/12    Page 5 of 17    Document 71

Shortly after making this call, Smith told Keri Blaszczynski, a Senior Administrative Assistant responsible for health insurance matters at the Bariatric Surgery Program at Froedtert, that he called Auxiant and was told that gastric bypass surgery was covered by the plan. An initial consultation was scheduled for plaintiff with Dr. James Wallace at Froedtert's Bariatric Surgery Program on or about July 18, 2005. Dr. Wallace advised Smith that he would be a good candidate for gastric bypass surgery, which Dr. Wallace determined was medically necessary given his history of congestive heart failure and other medical conditions, including diabetes, obstructive sleep apnea, hypertension, hypercholesterolemia and dyspnea on exertion.

On May 19, 2006, Ms. Blaszczynski called Auxiant in an effort to "double-check" the information provided by Smith. Blaszczynski was transferred to a voicemail box, where she left a message stating that she was calling to find out if there were benefits available under the plan for Smith's gastric bypass surgery. In the message, Ms. Blaszczynski provided information about Smith and his plan and left her direct dial number at Froedtert. Auxiant has no record of receiving this phone call. According to Blaszczynski, she received a return phone call from an Auxiant representative who told her that gastric bypass surgery was covered by the plan provided that it was medically necessary. The Auxiant representative provided specific information to Blaszczynski about Smith's benefits under the plan, including the deductible, the patient responsibility/co-insurance, and the portion of the deductible that Smith had satisfied for 2006. Blaszczynski was instructed, during the same return phone call, that she needed to call iProcert to provide clinical information so that a

medical necessity review could be performed. Auxiant denies that any Auxiant representative or employee returned a call to Blaszczynski in May of 2006. Instead, Auxiant believes Blaszczynski received a return call from an employee at iProcert.

Blaszczynski thereafter called iProcert to start the pre-certification process. On May 25, 2006, Blaszczynski received a return phone call from an iProcert employee, and Blaszczynski provided additional information concerning Smith's proposed surgery. The iProcert employee took this information, entered it into a database, then transferred Blaszczynski to the voicemail box for an iProcert nurse so that she could leave Smith's clinical information in the nurse's voicemail. The iProcert nurse called Blaszczynski back on May 25, 2006 and requested that she fax the pertinent medical records, at which point Blaszczynski sent a 48 page fax to iProcert as requested. On May 26, 2006, the iProcert nurse called Blaszczynski again to advise that the gastric bypass surgery would not be pre-certified until Smith had completed 3 months of physician supervised weight loss, a pulmonary evaluation and a nutritional evaluation. Upon receiving this information, Blaszczynski called Smith and told him about the steps he needed to take, and she made arrangements for him to satisfy those requirements.

Between May 26 and September 11, 2006, Smith took all the steps necessary to satisfy the requirements for getting the gastric bypass surgery pre-certified. In the months before the surgery, Auxiant approved for payment medical bills associated with the nutritional and pulmonary evaluations that were prerequisites to having the gastric bypass surgery pre-certified. Smith received a letter dated September 11, 2006 indicating that iProCert had

precertified the proposed surgery. The letter stated that the notice was "not a guarantee of payment. Benefits are subject to all eligibility, plan provisions and limitations in force at the time services are rendered. For benefit and eligibility information, please contact your benefit plan administrator Auxiant at (800) 245-0533." Smith received another letter from iProcert dated September 14, 2006 with correct dates for the procedure, containing the same disclaimer as the previous letter. Smith read both of these letters. On October 4, 2006, the night before he was scheduled to be hospitalized for the gastric bypass surgery, Smith called a number on his Auxiant identification card, 1-866-726-6584, the number for iProcert, to confirm that he had satisfied all of the requirements necessary to proceed with the surgery. When he reached this number, Smith was told that his precertification was approved.

Smith proceeded with the hospitalization and surgery on October 5 and 6, 2006. The surgery was successful and Smith was released from the hospital. Between October 27 and November 10, 2006, Auxiant processed and paid several medical bills that charged for medical services provided during Smith's gastric bypass surgery and in the days leading up to the surgery. On November 8, 2006, Auxiant provided Brenner Tank with a High Dollar claim report, identifying expenses associated with Smith's surgery. While he was attending a follow-up appointment at Froedtert after his surgery, Dr. Wallace told Smith that the cost of his surgery might not be paid under the plan due to an obesity exclusion. Thereafter, Smith received a series of EOBs (Explanation of Benefits) from Auxiant stating that services associated with the surgery would not be paid.

Both Smith and representatives of Froedtert filed appeals with Auxiant requesting that the costs of the surgery be paid. Auxiant denied all of these appeals, citing the obesity exclusion in the plan. After learning that Auxiant was denying his benefits, Smith worked with students at the University of Wisconsin Law School and exhausted all of the appeal requirements under the Plan. Thereafter, Smith attempted to negotiate payment arrangements with various medical providers, hoping to avoid being sued. Despite these efforts, Smith was sued by collection attorneys representing Froedtert and the Medical College, the two medical providers he could not come to an agreement with on a payment plan. The UW Law School then referred Smith to an attorney to assist him with regard to the Auxiant dispute and to negotiate with the collection attorneys representing these medical providers. Smith was ultimately able to negotiate payment plans that allowed him to make monthly payments (without interest accumulating) toward the balances sought. Under the two settlement agreements, Smith was obligated to pay a total of $40,841.73, and he has made all of the payments required to date. As of February 2012, Smith still owes $32,991.73 to Froedtert and the Medical College.

## II. Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

On appeal, the Seventh Circuit held that Smith's only avenue for relief was section 502(a)(3) of ERISA, which "permits a participant to obtain relief for a breach of fiduciary duty on behalf of himself as opposed to the plan." *Smith*, 639 F.3d at 283. "The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990). "This duty of course includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan, including an insurance plan. But the duty is not limited to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Kenseth v. Dean Health Plan*, 610 F.3d 452, 466 (7th Cir. 2010)

(internal citations omitted). "Accepting the allegations of Smith's complaint as true, one can see how Auxiant's preauthorization practices might constitute a breach of this duty. By preauthorizing a medical treatment without first ascertaining whether that treatment is covered by the insurance plan, and indeed without warning the insured that coverage might be denied notwithstanding the preauthorization, Auxiant could be thought to be misleading the insured to his detriment." *Smith* at 281. As it pertains to Auxiant's alleged breach of its fiduciary duties, the Seventh Circuit made a series of concluding observations that can serve as a guide for the Court's analysis on remand. "We have assumed the truth of the facts that Smith has alleged as we must at this stage of the litigation. Development of the record may reveal that some of these facts are untrue and may reveal additional facts that cast Auxiant's practices in a different light." *Smith* at 285.

First, the Seventh Circuit observed that "Smith did not attach to his complaint a copy of the health insurance plan that covers him and the other employees of Brenner Tanks, so we know nothing about what that plan tells an insured regarding the nature of Auxiant's preauthorization decisions or about how an insured may obtain coverage advice before undergoing medical treatment." *Id.* The Brenner Tank Plan clearly states that "pre-certification approval does not verify eligibility for benefits nor guarantee benefit payments." Additionally, a plan amendment reminded Smith that "pre-certifying a procedure does not mean that procedure is covered under our plan," and the back of Smith's insurance card warned that pre-authorization does not guarantee benefits. When participants call Auxiant to inquire about benefits, they are warned via pre-recorded message that "any information

-11-

provided is not a guarantee of benefits or payment and is subject to the terms and conditions in your group's health plan document," and Auxiant employees are directed to refer participants directly back to their plan language.

The Seventh Circuit also observed that "although Smith now concedes that gastric bypass surgery was not covered by the terms of the plan, we do not know how clear the plan language makes that particular exclusion to the reader and whether he should have understood that exclusion when he sought preauthorization for the procedure." *Smith* at 285. The language of the exclusion is simple and straightforward, stating that charges for services or supplies furnished for weight reduction or in connection with obesity, including morbid obesity, are not covered by the plan. This exclusion encompasses "obesity surgery, including but not limited to, stomach stapling, gastric bubble, intestinal/stomach bypass or suction lipectomy, regardless of whether or not weight reduction is medically appropriate." As the Seventh Circuit observed in *Kenseth*, "[w]e may take it as a given that a layperson would have understood" that a surgical procedure to reduce obesity "would not have been covered by the plan. The 2005 Certificate twice states that '[a]ny surgical treatment or hospitalization for the treatment of morbid obesity' is a non-covered service. That language is straightforward, and . . . we may assume that a layperson facing in-patient surgery would consult one or both sections and would, in fact, discover the exclusion." 610 F.3d at 474.

Also important is "what an insured is told when he receives preauthorization from Auxiant to undergo medical treatment." *Smith* at 285. Smith's notice warned him that preauthorization was "not a guarantee of payment. Benefits are subject to all eligibility, plan

-12-

provisions and limitations in force at the time services are rendered. For benefit and eligibility information, please contact your benefit plan administrator Auxiant at (800) 245-0533." Thus, "preauthorization of his gastric bypass surgery did not reasonably cause him to believe that the procedure would be covered by his workplace insurance." *Smith* at 285. "Pre-authorization decisions are not necessarily coverage decisions; preauthorization or precertification may signal nothing more than the insurer's conclusion that the intended medical treatment is necessary and appropriate for the insured's condition, without speaking to the separate question of whether the intended treatment is covered by the terms of the insurance plan." *Id.*

Smith argues Auxiant breached its fiduciary duties by failing to specifically identify the obesity exclusion when he requested pre-authorization. In other words, Smith argues that Auxiant had a duty to tell him that his surgery would not be covered before he underwent the procedure. *Kenseth* addressed this issue, albeit in *dicta*: "We are not called upon to decide in this case whether a health insurer . . . has a duty to give its insured binding advice before a medical service is rendered as to whether the policy will cover that service. Our decisions have observed generally that an insurer bears no duty to provide an advisory opinion to every beneficiary based on his or her unique circumstances." 610 F.3d at 472 (citing *Chojnack v. Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997)). When viewed in the context of the evidence discussed above, particularly the clarity of the plan language and the explicit disclaimers that accompanied the request for pre-authorization, Auxiant's failure to provide a binding pre-service benefit determination does not constitute a fiduciary breach.

-13-

Smith cites a provision in ERISA's claim-handling regulations which provides that in the "case of a pre-service claim, the plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan." 29 C.F.R. § 2560.503-1(f)(iii)(A). Smith argues that this provision imposes an obligation to issue a binding coverage determination in connection with a precertification request. While confusingly worded, the regulation appears to address only the prompt issuance of preauthorization decisions, not necessarily the ultimate issue of coverage under the plan.[1] Stated another way, the regulation presumes that the pre-authorization request is directed towards a benefit that is actually covered under the plan. In that respect, Smith's claim is not a "pre-service claim," which is defined as "any claim for a benefit under a group health plan with respect to which the terms of the plan condition receipt of the benefit, in whole or in part, on approval of the benefit in advance of obtaining medical care." 29 C.F.R. § 2560.503-1(m)(iii)(2). Since gastric bypass surgery is not covered by the plan, it is not a benefit that is conditioned upon advance approval. Even if the Court's interpretation is in error, this regulation cannot trump the clear language of the plan and the multiple disclaimers that accompanied Auxiant's pre-certification letters. While it may seem counterintuitive to

---

[1] This reading is supported by the Seventh Circuit's citation in the following passage: "Delays in preauthorization might also be seen as inconsistent with Auxiant's obligation to the insured. To the extent such delays exceed the period of time allowed by federal regulations [citing § 2560.503-1(f)(2)(iii)(A)] they could be deemed unreasonable and in that sense a breach of the duty of care that Auxiant owed to Smith and the other participants in the group health plan. And to the extent a delay in preauthorization might foreseeably harm the insured by forcing him to postpone the treatment his physician has recommended, it could be understood as a breach of the duty of loyalty to the insured." *Smith* at 282.

pre-certify a procedure that is not covered under the plan, Smith should not have initiated the process in the first instance, and he might not have done so had he actually read the plan language.

Finally, Smith argues that Auxiant misled him by telling him and his medical provider that the procedure was covered under the plan. Negligence in the course of advising an insured as to his rights and obligations under a plan, standing alone, is not actionable as a breach of fiduciary duty. *Frahm v. Equitable Life Assurance Soc'y of U.S.*, 137 F.3d 955, 958-60 (7th Cir. 1998). "We read *Frahm* and its progeny to absolve a fiduciary of liability for negligent misrepresentations made by an agent of the plan to a plan participant or beneficiary *so long as the plan documents themselves are clear and the fiduciary has taken reasonable steps to avoid such errors*." *Kenseth* at 470 (emphasis added). As noted, the plan language is clear, and the undisputed facts demonstrate that Auxiant takes reasonable measures to avoid giving incorrect advice. "In that situation, the fiduciary has done what it can reasonably be expected to do to ensure that the insured receives accurate and complete information; that mistakes may nonetheless occur is an unfortunate fact of life that does not bespeak actionable negligence on the part of the fiduciary." *Id.* at 472 (citing *Frahm* at 960).

### III. Attorney's Fees

As the prevailing party, Auxiant requests an award of attorney fees. 29 U.S.C. § 1132(g)(1). Auxiant is entitled to attorney's fees if Smith's position was not "substantially justified." *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis.*, 657 F.3d 496, 506 (7th Cir. 2011). Courts generally analyze the following factors: (1) the degree of

the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; (3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998). These factors inform the Court's "substantially justified" inquiry: "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Kolbe* at 506.

Smith's claim is based, at least in part, on his allegation that Auxiant told him that he was entitled to benefits for his gastric bypass surgery. Auxiant was able to escape liability in this case because "the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries as to their rights under those documents." *Kenseth* at 472. Despite the clarity of the plan documents, it was not entirely unreasonable for Smith to assume that he could forego actually reading the documents if Auxiant offered assurances that his procedure would be covered. Smith's position was substantially justified, not a bad faith attempt to harass Auxiant.

-16-

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Auxiant's motion for summary judgment [ECF No. 43] is **GRANTED**, but Auxiant's request for an award of attorney's fees is **DENIED**;

2. Smith's motion for summary judgment [ECF No. 41] is **DENIED**; and

3. This matter is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of April, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA
U.S. District Judge**